UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                         Case No. 18-CR-182 (JPS)

MARQUEL JOHNSON,

        Defendant.

---

## GOVERNMENT'S SENTENCING MEMORANDUM

---

The United States of America, by and through its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Margaret B. Honrath, Assistant United States Attorney, hereby submits the following memorandum in advance of the sentencing hearing set for October 31, 2019.

### I. Procedural Background

On September 18, 2018, a federal grand jury returned a 15-count indictment charging defendant Marquel Johnson with six Hobbs Act robberies and six counts of using a firearm during a crime of violence. Under the charges in the indictment, Johnson faced a potential mandatory minimum sentence of 48 years in prison. On September 19, 2019, Johnson pled guilty to six Hobbs Act robbery counts, two counts of brandishing a firearm during a crime of violence, and one count of discharge of a firearm during a crime of violence. At sentencing, Johnson faces a statutory mandatory minimum sentence of 24 years in prison on the firearm counts.

## II. Calculation of the Advisory Guideline Range

The government anticipates that the presentence report (PSR) will recommend an advisory sentencing range of 108 months to 135 months' imprisonment as to the Hobbs Act robbery counts. At sentencing, the United States will submit that the applicable advisory sentencing range is 97 months to 121 months' imprisonment as to the Hobbs Act robbery counts, disagreeing with the inclusion of Count Eight as a "pseudo" count for guideline purposes. Under U.S.S.G. § 2K2.4(b), the advisory sentencing guidelines for the § 924(c) counts is the statutory mandatory minimum, which must run consecutive to any other sentence.

## III. Constitutionality of Consecutive Sentences under 18 U.S.C. § 924(c)

In her objections to the PSR and sentencing memorandum, Johnson submits that the statutory requirement that Title 18, United States Code, Section 924(c) run consecutive to any other sentence is both unconstitutional and conflicts with the factors in Title 18, United States Code, Section 3553(a). Johnson questions whether "consecutive to any other sentence" includes a state sentence. Finally, Johnson seeks "declaratory relief" from this Court arguing that her bifurcated state sentence of a maximum of six years in prison with three years initial confinement followed by three years of extended supervision should be viewed by this Court as six year prison sentence. The United States will address each of these arguments in turn, followed by an examination of the 3553(a) factors relevant to this case.

### a. Johnson's State Sentence For this Court's Consideration Consists of Three Years in Prison

Title 18, United States Code, Section 3585, delegates responsibility for sentencing computation to the Federal Bureau of Prisons. Therefore, it is not necessarily within this Court's discretion to "declare" precisely how the Bureau of Prisons will compute the defendant's state sentence. That being said, to the extent that this Court needs to consider Johnson's state

2

conviction for First Degree Recklessly Endangering Safety in Milwaukee County Circuit Court Case No. 2018CF4106, when imposing the federal sentence, the United States submits that Johnson's state sentence at this juncture amounts to three years in prison.

Johnson was sentenced to a bifurcated sentence of three years of initial confinement followed by three years of extended supervision, for a maximum potential sentence of six years in prison. According to the Wis. Stat. 973.01(2):

> A bifurcated sentence is a sentence that consists of a term of confinement in prison followed by a term of extended supervision under s. 302.113. The total length of a bifurcated sentence equals the length of the term of confinement in prison plus the length of the term of extended supervision.

Johnson is arguing that her state sentence was six years in prison, because that is the maximum term of confinement she is eligible to receive in the state case. However, this conclusion is not correct on a practical level or based upon undersigned counsel's consultation with a Federal BOP Computation Specialist. On a practical level, Johnson's argument essentially assumes that Johnson's extended supervision will be revoked, and that she will then receive the maximum revocation sentence of three years in prison.

According to the BOP Computation Specialist's review of Johnson's Judgment, because Johnson is currently in state custody serving the three years of initial confinement, she is currently not receiving federal sentencing credit. Her federal sentence will not begin until after her three-year state prison term is complete. At that time, she will transfer to federal custody, and will then begin the sentence this Court imposes, 24 years of which must run consecutive to her state sentence. Therefore, as she sits before this Court at sentencing, Johnson's imposed state sentence is three years in prison, followed by three years of supervision. If her extended supervision is revoked in the future, she faces a maximum three years on the revocation, which BOP would view as a new sentence.

3

Case 2:18-cr-00182-JPS   Filed 10/29/19   Page 3 of 10   Document 70

### b. A Sentence Under § 924(c) Must Run Consecutive to Any Other Sentence, Including a State Sentence.

To the extent that Johnson is contesting that her state sentence run consecutive to her sentence on the § 924(c) counts, Seventh Circuit precedent and the language of the statute mandate that Johnson's sentence on the § 924(c) counts run consecutive to her state prison sentence. Title 18, United States Code, Section 924(c)(1)(D)(ii) provides that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed on the person for the crime of violence . . . during which the firearm was used, carried, possessed." While addressing an argument similar to Johnson's, the Seventh Circuit in *United States v. Thomas*, 77 F.3d 989, 992 (7th Cir. 1996), held that "Section 924(c) unambiguously requires a term of imprisonment consecutive to any other term of imprisonment, including state terms of imprisonment." Therefore, Johnson's three-year state prison term must run consecutive to her 24-year mandatory minimum sentence on the § 924(c) counts.

### c. Section 3553(a) Does Not Conflict with the Statutory Mandatory Minimum Sentences Imposed by Congress in § 924(c).

In her Global Objection to the PSR and reiterated in her sentencing memo, Johnson argues that § 924(c)'s consecutive mandatory minimum terms of imprisonment are unconstitutional insofar as they conflict with Title 18, United States Code, Section 3553(a). Johnson also submits that the plea offer in this case violates the First Step Act. At Johnson's arraignment, which occurred before the enactment of the First Step Act, Johnson was informed that she faced a total mandatory minimum sentence of 132 years in prison on the charges in the Indictment. Therefore, the First Step Act has reduced Johnson's mandatory minimum prison exposure by over 60%.

The Supreme Court in *Dean* analyzed the mandatory minimum sentencing provisions of § 924(c) in light of the balancing-factors in § 3553(a). *Dean* allows for a sentencing judge to consider the mandatory minimum sentence under § 924(c) when imposing the sentence on the predicate offenses, and to examine the § 3553(a) factors with respect to each count of conviction and the total sentence imposed. *Dean v. United States*, 137 S.Ct. 1170 (2017). *Dean* thus leaves no room for an argument that § 924(c) conflicts with § 3553(a). Nor did the *Dean* Court suggest any constitutional infirmity in § 924(c)'s requirement of consecutive sentencing. Johnson's argument on this point – which, if taken to its logical conclusion, could invalidate numerous provisions of the U.S. Code – therefore fails.

### IV. A Sentence Above the Mandatory Minimum But Below the Low-End of the Guidelines is an Appropriate Sentence under 18 U.S.C. § 3553(a)

Overall, the court must impose a sentence that is sufficient but not greater than necessary. To this end, the court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, to afford adequate deterrence, and protect the public from further crimes by the defendant; and to provide the defendant with needed training opportunities or medical care. *See* 18 U.S.C. § 3553(a).

#### A. *Nature of the Offenses*

Over and over again during five-day stretch, Marquel Johnson demonstrated an utter disrespect for the law and a disregard for human life. The offenses in this case can be broken into three groups: (1) taxi cab robberies before the Petro Mart shooting; (2) Petro Mart shooting; and (3) robberies after the Petro Mart shooting. Johnson's involvement evolved from behind-the-scenes orchestrator to lead aggressor. Initially, Johnson and her friend, Foster, targeted taxi

5

cab drivers. Johnson called the taxi cab companies, arranged for a pick-up, and Foster, in possession of Johnson's gun, yelled at, manhandled, and robbed the drivers. All the while, Johnson remained in a nearby car, demanding that Foster act quickly in stealing the driver's meager earnings. During the first few robberies, Foster pointed Johnson's handgun at the drivers, pressed it into their heads, and on some occasions whacked them with the gun, all in the close confines of the taxi cab. After one of the taxi cab robberies, when the driver disobeyed her orders not to move, Foster discharged Johnson's gun. An hour later, Johnson and Foster committed the brutal robbery at Petro Mart.

Johnson's disregard for human life during the Petro Mart robbery, and her continued violent actions after that robbery, cry out for a prison term above the mandatory minimum. At their core, the facts of the Petro Mart robbery reflect the partnership between Johnson and Foster. They entered the Petro Mart together. Without hesitation, Foster brandished Johnson's handgun when approached by the store employee, who was curious about the 2:30 a.m. customers. Foster pointed the handgun right at the employee and lunged toward him. As the employee attempted to shield himself and flee to the register area, Foster shot him in the head. The employee fell to the ground, where he lost consciousness. The last thing he heard was Johnson imploring Foster to go get the money. The last thing he felt was Foster trample over his stomach to get to the register. The footage shows Foster rummaging through the register while Johnson implores her to hand over the gun. Foster eventually slips the gun to Johnson through the cash tray. Johnson then, in control of the gun, walked over to the victim with the gun brandished. At that point, Johnson would have seen the victim bleeding out of his head, a view that would have looked similar to this:

6



In cold-blooded fashion, Johnson stood over the victim's body, ensuring that he no longer served as a threat to them, and eventually fled the store with Foster. Had a customer not entered the store a few minutes later and helped call for aid, Johnson might be facing a homicide charge.

Less than an hour after the robbery, Johnson repeatedly conducted internet searches to get details on the damage she and Foster had done. She conducted Google searches using the terms "5 gas man shot in the head august 22 2018" and "gas on5. an [sic] arthur shot ankilled 8/22/18." Most chillingly, less than 24 hours after the Petro Mart shooting, Johnson sent a Facebook message to an unknown person that read, "U better check my background i shot hoes like you for fun." Johnson's letter of contrition to the Court submits that she was "very scaried [sic] when there was a victim that was hurt. I didn't know how to judge my actions. I became scaried [sic] of the whole situation. I followed a person that I myself was afraid to say no too [sic]." ECF No. 69, 1-2. However, Johnson's merciless actions in the Petro Mart shooting and her Facebook post following

7

the robbery defy her submission that was scared or was a follower in these heinous crimes. Moreover, instead of laying low and abstaining from violent crime after the Petro Mart shooting, Johnson continued with victimizing members of our community, taking on the aggravating role of lead aggressor toting the same .22 caliber handgun.

Less than 48 hours after leaving the Petro Mart employee bleeding on the gas station floor, Johnson committed two more armed robberies. She pressed her gun into the back of a taxi cab driver's head, shot it off to threaten the driver, and pointed it at another gas station employee. Below is a photo of Johnson within 48 hours after the Petro Mart shooting at the BP Gas Station.



Later that day, still undeterred, Johnson engaged in a high-speed car chase with police, driving excessive speeds, disregarding stop signs and a red light, and ultimately crashing her stolen car into a van carrying a mother and four children. It's a miracle that Johnson's impetuous, violent conduct did not cause more injuries or even deaths within our community.

8

Not only did these robberies devastate the victims who were directly involved and their families, but these robberies had a trickle-down effect on hundreds within our community. For example, the close-knit community of taxi cab drivers in the Milwaukee-area was paralyzed during this rampage. Drivers wondered whether they should take the next call and feared they would be the next one beaten in their cab. In anticipation of Johnson's trial, the victim taxi-cab drivers shook with fear and emotion as they recounted what happened to them during the robberies.

The most devastating, irreversible damage occurred to B.M., the Petro Mart employee. The bullet pierced the frontal lobe of B.M.'s brain, the area that controls one's personality. Although he is grateful that he survived and was able to witness the birth of his first child this past year, he's a shell of who he was. Johnson and Foster robbed him of his personality. In a moment, they transformed him from a chatty, happy man who had just celebrated his first wedding anniversary, to someone who angers easily and inexplicably. Although the costs of incarcerating Johnson will be enormous, the costs incurred to our society by senseless crimes of violence like these are immeasurable.

**B.** *History and Characteristics of the Defendant*

The PSR details Johnson's significant psychological and mental health issues and her history of physical and sexual abuse and trauma. To the extent that the "system" failed Johnson, her history and characteristics only serve as an explanation for her involvement in these crimes, but not an excuse. Even after having been victimized time and time again, Johnson made the intentional decisions to victimize others, strangers who were just trying to make ends meet at low-wage jobs. Johnson took it upon herself to set-up the taxi cab robberies, provided a gun to her friend, implored her friend to continue with the robbery after the shooting, and continued to turn innocent people's lives upside down even after a victim was shot in the head.

9

## V. Conclusion

It is with all of this in mind that the United States believes a total sentence of 30 years in prison is appropriate, comprising of the 24-year mandatory minimum plus the below-guideline sentence of 6 years (72 months) on the robbery counts. The United States further recommends that Johnson's sentence on the robbery counts run concurrent with her state sentence. The government anticipates making additional statements at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 29th day of October, 2019.

        MATTHEW D. KRUEGER
        United States Attorney

By:   *s/ Margaret B. Honrath*
        Assistant United States Attorney
        Illinois Bar Number: 6296758
        Attorney for Plaintiff
        Office of the United States Attorney
        Eastern District of Wisconsin
        517 East Wisconsin Avenue, Room 530
        Milwaukee, Wisconsin 53202
        Telephone: (414) 297-1582
        Fax: (414) 297-1738
        E-Mail: Margaret.Honrath@usdoj.gov